OPINION
{¶ 1} Appellant, Charles J. Williams, appeals from the March 14, 2002 judgment entry of the Trumbull County Court of Common Pleas, in which appellant was sentenced for aggravated robbery, felonious assault, and complicity to tampering with evidence.
 {¶ 2} On November 20, 2001, appellant was indicted by the Trumbull County Grand Jury on three counts of aggravated robbery, felonies of the first degree, in violation of R.C. 2911.01(A)(1) and (C) with firearm specifications in violation of R.C. 2941.145(A); one count of felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2) with a firearm specification in violation of R.C. 2941.145(A); and one count of complicity to tampering with evidence, a felony of the third degree, in violation of R.C. 2923.03(A)(1) and/or (3) and R.C.2921.12(A)(1) and (B).
 {¶ 3} On November 21, 2001, appellant entered a not guilty plea at his arraignment. The matter proceeded to a jury trial which commenced on February 4, 2002. On February 8, 2002, the jury returned a verdict of guilty on all counts except count two, one of the three counts of aggravated robbery with a firearm specification, in which the jury found appellant not guilty. On March 13, 2002, a sentencing hearing was held. Pursuant to the March 14, 2002 judgment entry, the trial court sentenced appellant to a term of nine years as to count one, aggravated robbery, and three years as to the firearm specification, with the terms to be served consecutively; nine years as to count three, aggravated robbery, and three years as to the firearm specification, with the terms to be served consecutively to one another and to those of count one; seven years as to count four, felonious assault, with its firearm specification merging with count three, to be served consecutive to all other sentences; and four years as to count five, complicity to tampering with evidence, to be served consecutive to all other sentences, for an aggregate term of thirty-five years.
 {¶ 4} The facts emanating from the record are as follows: on September 29, 2001, at approximately 1:30 a.m., two men entered a Dairy Mart, located at 606 North Park Avenue in Warren, Ohio, Trumbull County. Robert Clemons ("Clemons"), who was working at the Dairy Mart, testified that the taller man carried a gun and wore a green coat and a ski mask. Clemons stated that the taller man was white, which he was able to determine from viewing his hands since the man was not wearing gloves. The shorter, stockier man was also white, based upon Clemons's determination, wore a black coat and a shirt wrapped around his head and face. The taller man ordered Clemons to open the cash register and stated "[y]ou know the routine, Bob, big bills first." Clemons, in fact, had been robbed fourteen previous times. After Clemons handed over about $60, the taller man also demanded cigarettes, specifically Newport 100s in a box. The two men then fled on foot. Clemons directly contacted the police. A couple of days later, Clemons quit his job. The robbery was captured on videotape. Clemons was subsequently unable to make a positive identification in a police lineup.
 {¶ 5} A second occurrence took place on October 2, 2001, at approximately 1:00 a.m., at G.E.M. Food Mart ("G.E.M."), a convenience store located at 860 Parkman Road, in Warren, Ohio. Daoud Muntaser ("Muntaser"), owner of G.E.M., testified that he was outside of G.E.M. talking with a friend when he was approached by a tall white man who put on a ski mask and held what appeared to be a .38 revolver. Muntaser stated that he was able to see the white man's face for a few seconds, before he put on his ski mask. The armed man demanded Muntaser's money and Muntaser stated that he had none. While reaching into his pocket to get his cell phone, Muntaser testified that the robber must have thought that he was reaching for a gun, and thus, fled on foot with no money. After viewing a photographic lineup, however, Muntaser was unable to identify the subject.
 {¶ 6} Another robbery was also committed on October 2, 2001, which occurred at approximately 1:14 a.m. at Dairy Mart, located on the corner of North Leavitt Road and Parkman Road in Warren, Ohio. Gary Howard ("Howard") was an employee of this Dairy Mart and was working when the robbery occurred. According to Howard's testimony, a tall, white man wearing a ski mask entered the store and demanded money. Howard said that he was able to determine that the man was white due to the large eyeholes in his mask. Howard stated that the man carried a small revolver and was wearing a gray and white plaid flannel shirt, blue jeans, and surgical gloves. At first, Howard thought that the man was joking, until he fired a bullet into the lottery machine just behind where Howard was standing. Howard then opened the cash register and began handing over one and five dollar bills, but the robber grabbed the twenty dollar bills and the drop envelope and left the store. Howard then went to look out the store window and the robber fired a second shot at the window. Hoping to get a license plate number, Howard followed the robber out the front door. The robber turned and fired a third shot at Howard, which hit Howard in the arm. Before leaving the store's property, the robber fired a fourth shot from his gun. The robber then fled on foot. Howard was transported to the hospital by ambulance, was hospitalized for three days, and still has the bullet inside his body. Howard missed two weeks of work, and later returned under restrictions imposed by his doctor.
 {¶ 7} The events of this last robbery were captured on videotape. Approximately two weeks after the robbery, Howard viewed a photographic array in which he identified an individual that "resembled" the robber. The first bullet fired toward the lottery machine was not found by the police who examined the scene, but rather was discovered toward the end of November 2001, by the store manager.
 {¶ 8} On October 4, 2001, appellant was arrested on unrelated charges and booked into the Trumbull County Jail. During the course of his incarceration, appellant had several conversations with a fellow inmate, Parrish M. Henderson ("Henderson"). According to Henderson's testimony, appellant told him about his armed robbery spree. Henderson stated that appellant told him that he robbed a Dairy Mary and shot the clerk, who thought that he was joking. Henderson also testified that appellant mentioned his aborted robbery at the G.E.M. store where he tried to rob an "Arab guy." Also, Henderson stated that appellant told him that he wore a ski mask during the robberies. Henderson approached the police regarding appellant's descriptions of the robberies. While in jail, Henderson agreed to wear a wire during future conversations with appellant. However, there were no further discussions about the robberies.
 {¶ 9} Sergeant Gary Vingle ("Sergeant Vingle"), who is employed in the criminal investigations division of the Warren City Police Department, was the lead investigative officer in these robberies. Sergeant Vingle submitted the videotapes of both Dairy Mart robberies to NASA where they were slowed and compared side by side. Still photographs were then taken from the videos. Sergeant Vingle noticed similarities in the tennis shoes worn by the suspect during both robberies and confiscated a similar pair from appellant's personal belongings at the Trumbull County Jail.
 {¶ 10} Two search warrants were executed on October 10, 2001, which included appellant's apartment located at 1555 Hollywood N.E., in Warren, Ohio, as well as the home of appellant's mother, Debbie Smith ("Smith"), located at 3244 Tod Avenue N.W. in Warren, Ohio. Because Sergeant Vingle received information from appellant's landlord that his apartment was being vacated and cleaned out by Smith, Smith's residence was searched first, however, nothing of any evidentiary value was found. Next, a search was conducted at appellant's residence and because nothing was found inside, appellant's outdoor garbage can was searched. An empty box of Newport 100s cigarettes was discovered in appellant's trash can.
 {¶ 11} Danielle Holbrook ("Danielle"), who was appellant's girlfriend at that time, was interviewed by police on two separate occasions as part of their investigation, and also testified for the state at trial. Danielle admitted to lying to police in the first interview on October 15, 2001, in which she stated that she had no knowledge of appellant committing any robberies. Danielle testified that she lied because she was afraid of appellant due to past violent episodes. However, Danielle stated that she told the truth in a subsequent interview with police on October 23, 2001.
 {¶ 12} During that second interview and pursuant to her testimony at trial, Danielle said that she was aware that appellant committed the September 29, 2001 Dairy Mart robbery. Danielle testified that around midnight, she loaned her vehicle to appellant, who wore white and blue tennis shoes and a green jacket, and his friend "Bo," a short, chubby, dark-haired, light-skinned Mexican, who wore a black coat. According to Danielle, when appellant and "Bo" returned home a few hours later, they told her that they had robbed a Dairy Mart and stated that they both went inside the store and demanded money and cigarettes. Danielle testified that appellant smoked Newport 100s cigarettes in a box. Danielle viewed both Dairy Mart videos and identified appellant in each one from his clothes, shoes, and the way that he walked. Danielle further stated that appellant scoured the newspaper on October 3, 2001, for a story about a robbery where the clerk got shot. Also, Danielle admitted to stealing her mother's, Penny Holbrook's ("Penny"), .22 revolver in September 2001, which appellant traded for crack cocaine. According to Danielle, the drug dealer who made the exchange was Darnell Farrier ("Hoagie").
 {¶ 13} While incarcerated, appellant made numerous phone calls to Danielle, which were monitored by jail officials, taped and preserved on compact discs. In a conversation taped on October 11, 2001, appellant instructed Danielle to contact Hoagie in order to get the gun back so that she could dispose of it. According to Danielle, she went to Hoagie's motel room at the Park Inn in Niles, Ohio, but Hoagie refused to give her the gun. On October 13, 2001, Niles Police responded to a dispatch that weapons were being sold from Hoagie's motel room. After searching Hoagie's room, Niles Police confiscated six firearms, including a .22 revolver. Although Danielle was unable to retrieve and destroy the gun, she played a part, per appellant's instructions, in destroying the green jacket by giving it to his mother who disposed of it.
 {¶ 14} Jack Oakes ("Oakes"), Penny's son and Danielle's half-brother, also testified for the state at trial. Oakes stated that he gave Penny a .22 revolver a couple of years ago. Around October 15, 2001, Oakes reported to the Warren Police Department that the gun had been stolen. However, Oakes later found out from Penny that Danielle had taken the gun from Penny's home. Sergeant Vingle confirmed that the .22 revolver recovered from Hoagie's motel room was the one which Oakes had reported stolen.
 {¶ 15} Michael E. Roberts ("Roberts"), a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI"), testified that he analyzed the .22 revolver and bullet fragment recovered from the lottery scanner from the North Leavitt/Parkman Road Dairy Mart. Roberts determined that there were similarities between the gun and the badly mutilated bullet. However, Roberts could not conclusively state that the bullet was fired from the same gun.
 {¶ 16} Appellant testified in his own defense and denied committing the robberies. Appellant acknowledged that he had been to prison about four or five times for burglaries, breaking and entering, receiving stolen property, and failed drug screens while on probation. Appellant also stated that he smoked Camel cigarettes, had a crack cocaine habit, and was unemployed.
 {¶ 17} Pursuant to the March 14, 2002 judgment entry, appellant filed a timely notice of appeal on April 9, 2002, and makes the following assignments of error:
 {¶ 18} "[1.] The trial court erred by imposing consecutive sentences upon appellant.
 {¶ 19} "[2.] [Appellant] received ineffective assistance of counsel in violation of his rights pursuant to the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.
 {¶ 20} "[3.] [Appellant's] conviction[s] are against the manifest weight of the evidence."
 {¶ 21} In his first assignment of error, appellant argues that the trial court erred by sentencing him to serve consecutive sentences where the record reveals that such are disproportionate to the seriousness of his conduct.
 {¶ 22} R.C. 2929.14(E)(4) provides that "[if] multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 23} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 24} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 25} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 26} In State v. Rupert, 11th Dist. No. 2001-L-151,2002-Ohio-6911, at ¶ 12, this court stated that:
 {¶ 27} "[w]hen reviewing the imposition of a sentence upon a defendant by a trial court, this court will not disturb the sentence unless we find, by clear and convincing evidence, that the record does not support the sentence or that the sentence is contrary to law. Statev. Norwood (June 8, 2001), 11th Dist. No. 2000-L-072, 2001 Ohio App. LEXIS 2573, at 6. An appellate court may modify or vacate a sentence if the sentence is contrary to law. R.C. 2953.08(G). However, a court of appeals should modify rather than remand a cause to the lower court for re-sentencing sparingly. This is especially so when the matter is being remanded because the trial court did not set forth sufficient reasons supporting the consecutive sentences. These cases should be sent back for clarification as the trial court clearly is in `the better position to judge the defendant's dangerousness and to ascertain the effect of the crimes on the victims.' State v. Jones, 93 Ohio St.3d 391 at 400, 2001-Ohio-1341. An appellate court should modify a sentence only if that sentence is clearly unsupported by the record. Otherwise, the trial court should be given an opportunity to explain the reason why the sentence was imposed. Id." (Parallel citations omitted.)
 {¶ 28} This court further stated in Rupert, supra, at ¶ 14 that:
 {¶ 29} "[w]hen a trial court decides to impose consecutive sentences under R.C. 2929.14, the court also must follow the requirements set forth in R.C. 2929.19(B). State v. Hoskins (Mar. 16, 2001), 11th Dist. No. 2000-A-0037, 2001 Ohio App. LEXIS 1232, at 9. Pursuant to R.C.2929.19(B)(2)(c), the trial court is to justify its imposition of consecutive sentences by making findings that give the court's reasons for selecting this sentence. State v. Bradford (June 1, 2001), 11th Dist. No. 2000-L-103, 2001 Ohio App. LEXIS 2487, at 10. The trial court must state on the record its reasons for imposing consecutive sentences. R.C. 2929.19(B)(2)(c); Jones, supra, at 399. The reasons are the court's provision of a factual explanation setting forth the basis for the findings. State v. Edmonson (1999), 86 Ohio St.3d 324, 326. These factual considerations may be given after the imposition of consecutive sentences. State v. Sharp, 3d Dist. No. 1-02-06, 2002-Ohio-2343, at ¶ 15." (Parallel citations omitted.)
 {¶ 30} In State v. Comer (2003), 99 Ohio St.3d 463, paragraph one of the syllabus, the Supreme Court recently held that "[p]ursuant to R.C. 2929.14(E)(4) and [R.C.] 2929.19(B)(2)(c), when imposing consecutive sentences, a trial court is required to make its statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing."
 {¶ 31} In the case at bar, the trial court made specific findings pursuant to R.C. 2929.14(E)(4) and 2929.19(B)(2)(c) when it sentenced appellant, and stated at the sentencing hearing on March 13, 2002:
 {¶ 32} "[1] the defendant has served four prior prison sentences; [2] the defendant has a lengthy record of juvenile adjudications and adult convictions; [3] the defendant has not responded favorably to sanctions previously imposed for criminal acts; [4] the defendant shows no genuine remorse; [5] the victim of the felonious assault suffered serious physical harm; [6] the defendant attempted to cause and did cause physical harm with a weapon; [7] the defendant is a career criminal; [8] the defendant has committed the worst form of the offenses for which he was convicted; [9] the defendant poses the greatest likelihood of committing future crimes; [10] the defendant is a flight or escape risk; [11] consecutive terms are necessary to protect the public and adequately punish the defendant; [12] consecutive terms are not disproportionate to the defendant's conduct and to the public danger posed by the defendant; [13] the defendant's criminal history shows that consecutive terms are needed to protect the public; [and 14], the defendant was awaiting trial on an escape charge and under post-release control sanctions after serving a prison term when these offenses were committed."
 {¶ 33} Furthermore, the trial court also made the foregoing findings pursuant to R.C. 2929.14(E)(4) and 2929.19(B)(2)(c) in its March 14, 2002 judgment entry.
 {¶ 34} In the instant matter, appellant argues that his aggregate sentence of thirty-five years for these convictions is too great. Appellant submits that one can be convicted of murder in the state of Ohio and serve less time before being eligible for parole. Thus, appellant stresses that the punishment imposed in this case should not exceed the punishment imposed upon someone who intentionally takes another's life. We are not persuaded by appellant's reasoning.
 {¶ 35} Based on Rupert and Comer, supra, the sentence imposed upon appellant is supported by the record and, therefore, is not contrary to law. In the first armed robbery, appellant demanded money and cigarettes from Clemons at gunpoint. Appellant's actions induced fear in Clemons, who was so shaken by the incident that he quit his job. Also, Clemons was so overcome with emotion during direct examination that he could not finish his testimony because he "relived" the robbery, in which he believed that he was going to get shot by appellant. In the other armed robbery, appellant again demanded money from a clerk. Appellant discharged his gun four times in which Howard sustained a bullet wound and needed to be transported to the hospital by ambulance. Howard was hospitalized for three days and missed two weeks of work. The bullet traveled down Howard's arm to his chest, where it remains lodged to this day.
 {¶ 36} The trial court's findings and reasons given at the sentencing hearing, as well as the March 14, 2002 judgment entry specifically address the necessity to impose consecutive sentences to protect the public from appellant and are not disproportionate to appellant's conduct or the danger posed by him. Pursuant to R.C.2929.14(E)(4)(a), appellant committed the offenses not only while on post-release control, but while he was awaiting trial on an escape charge. Also, based on R.C. 2929.14(E)(4)(c), appellant's history of criminal conduct demonstrates that consecutive sentences are necessary in order to protect the public from future crime by appellant. The other reasons of the trial court go to R.C. 2929.19(B)(2)(c), including the fact that previous attempts to rehabilitate appellant have been unsuccessful. Therefore, the trial court did not err in imposing consecutive sentences due to the fact that such sentences are statutorily permitted and sustained by the record. Thus, appellant's first assignment of error is without merit.
 {¶ 37} In his second assignment of error, appellant argues that he received ineffective assistance of counsel in violation of his rights pursuant to the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. Appellant specifically contends that his trial counsel was ineffective for failing to object or recommend a sentence due to the fact that he was facing and is now ordered to serve an aggregate prison term of thirty-five years.
 {¶ 38} Strickland v. Washington (1984), 466 U.S. 668, 687
states:
 {¶ 39} "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable."
 {¶ 40} "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at paragraph two of the syllabus. State v. Bradley
(1989), 42 Ohio St.3d 136, 142, quoting Strickland, supra, at 694, states: "To warrant reversal, `(t)he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"
 {¶ 41} This court stated in State v. Rudge (Dec. 20, 1996), 11th Dist. No. 95-P-0055, 1996 Ohio App. LEXIS 5807, at 35-36, that "`[s]trategic and tactical decisions will not form the basis of a claim of ineffective assistance of counsel, even if there had been a better strategy available to him.' * * * State v. Pue (July 26, 1995), 7th Dist. No. 92 CA 164, 1995 Ohio App. LEXIS 3151, at 2, * * *. "`Errors of judgment regarding tactical matters do not substantiate a claim of ineffective assistance of counsel." * * *.' State v. Lundgren (Apr. 22, 1994), 11th Dist. No. 90-L-15-125, 1994 Ohio App. LEXIS 1722, at 40-41."
 {¶ 42} In the case sub judice, appellant notes that he is not arguing that his counsel was ineffective throughout the entire trial, but rather was deficient during sentencing. Appellant specifically contends that trial counsel did not speak to a recommendation at sentencing nor did he object after the trial court ordered appellant to serve his terms consecutively. Appellant stresses that regardless of whether trial counsel performed effectively with respect to all other aspects of this case, had counsel recommended a sentence and argued in support of that recommendation, or even simply objected to the imposition of consecutive sentences, the result with respect to sentencing would have been different. We disagree.
 {¶ 43} Appellant committed four separate and distinct crimes and was sentenced to less than the maximum on all four charges. The trial court properly merged the firearm specification in counts three and four. As such, appellant's sentence was not contrary to law. Because appellant's sentence was sufficient and properly complies with R.C.2929.14(E)(4) and R.C. 2929.19(B)(2)(c), appellant's counsel did not err by not recommending another sentence or failing to object during sentencing. See State v. Richards, 5th Dist. No. 2002CA00057,2002-Ohio-6847, at ¶ 23. Based on Strickland, supra, appellant fails to show that counsel's performance during sentencing was deficient and that the deficient performance prejudiced the defense. Thus, there has been no showing of the reasonable probability that had appellant's counsel done things in another manner, the outcome would have been different. Therefore, appellant's second assignment of error is without merit.
 {¶ 44} In his third assignment of error, appellant argues that his convictions are against the manifest weight of the evidence.
 {¶ 45} As this court stated in State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13-15:
 {¶ 46} "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented.
 {¶ 47} "`* * *[M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.
 {¶ 48} "`In determining whether the verdict was against the manifest weight of the evidence," (* * *) (t)he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)"' (Citations omitted.) (Emphasis sic.) * * *"
 {¶ 49} A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 50} In the instant matter, appellant alleges that because the evidence presented at trial was so confusing, nearly anyone who had been named as a defendant could have been convicted of the crimes with which he was charged. Appellant stresses that there was no facial identification made, no clarification as to how his green jacket differed from any other green jacket, and that the shoes worn in the robberies did not belong to him because he put his shoes in Danielle's car after they played basketball. Appellant also argues that the bullet recovered from one of the robberies and the gun recovered from Hoagie could not be scientifically connected after analyzed by BCI. It is appellant's contention that the reason he told Danielle to get the gun back from Hoagie was because Raymond Reagan, who visited appellant in jail, stated that the gun had previously been used in a crime and that it should be destroyed. Also, appellant stresses that Henderson and Danielle testified against him as a result of either personal gain or being threatened. Finally, appellant alleges that two of the three victims testified that the individual(s) who robbed them may have been Hispanic, therefore, it is likely that "Bo" and his brother "Will" were the robbers. We disagree.
 {¶ 51} With respect to the green jacket, Henderson, Penny, and Danielle testified that appellant owned such a jacket, which was photographed from the videotape during the first robbery. Also, appellant telephoned Danielle from jail, which was recorded, and told her to get rid of all of his clothes, including the green jacket, from the apartment. The tennis shoes captured on the videotapes from both robberies were markedly similar if not identical to those confiscated from appellant's personal belongings from the county jail, not from Danielle's car as alleged by appellant. Clemons testified that he believed that a .22 revolver was used when he was robbed, and Howard described the gun as "a small revolver." The .22 revolver used in the robberies was captured on the videotapes. Also, the jury heard the taped telephone conversations between appellant and Danielle wherein appellant told her to retrieve the .22 revolver from Hoagie and dispose of it. Although forensic scientist Roberts could not conclusively connect the confiscated revolver to the bullet fragment recovered from the second Dairy Mart robbery, he could not eliminate the possibility that the bullet was fired from a .22 revolver.
 {¶ 52} Furthermore, Henderson testified and the record reflects that he received no personal gain from his cooperation in the instant matter. Danielle admitted to initially lying to the police when she stated that she had no knowledge of appellant committing any robberies because of her fear of appellant due to past violent episodes. However, Danielle testified that on September 29, 2001, she loaned her car to appellant and "Bo" around midnight. According to Danielle, appellant wore white and blue tennis shoes and a green jacket and "Bo", a short, light-skinned Mexican, wore a black coat. Danielle said that both appellant and "Bo" told her that they had robbed a Dairy Mart in which they demanded money and cigarettes. Also, Danielle stated that appellant smoked Newport 100s cigarettes in a box, which detectives found in appellant's trash. Danielle identified appellant as the robber after viewing the videotapes. Clemons also testified that the taller robber wore a green jacket and demanded money and Newport 100s cigarettes in a box, and the shorter robber wore a black coat, which was captured on videotape. Therefore, based on Schlee and Thompkins, supra, the jury did not clearly lose its way in convicting appellant. Thus, appellant's third assignment of error is without merit.
 {¶ 53} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Trumbull County Court of Common Pleas is affirmed.
Judgment affirmed.
JUDITH A. CHRISTLEY and DIANE V. GRENDELL, JJ., concur.